1   Marta Palacios, Bar No. 206018
    E-mail: MPalacios@perkinscoie.com
2   PERKINS COIE LLP
    4 Embarcadero, Suite 2400
3   San Francisco, CA 94111
    Telephone: 415.344.7000
4   Facsimile: 415.344.7050

5   Susan E. Foster, WA Bar No. 18030 (*pro hac to follow*)
    E-mail: SFoster@perkinscoie.com
6   Cori Gordon Moore, WA Bar No. 28649 (*pro hac to follow*)
    E-mail: CGMoore@perkinscoie.com
7   PERKINS COIE LLP
    1201 Third Avenue, Suite 4800
8   Seattle, Washington 98101-3099
    Telephone: (206) 359-8000
9   Facsimile: (206) 359-9000

10

11   Attorneys for Plaintiffs
    **STMicroelectronics, Inc. and STMicroelectronics N.V.**

12

13               IN THE UNITED STATES DISTRICT COURT

14            FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                   SAN JOSE DIVISION

16           CV10- 5023

17

| | |
|---|---|
| 18   **STMicroelectronics, Inc.;** | NO. |
|      **STMicroelectronics N.V.,** | **STMICROELECTRONICS, INC. AND** |
| 19 | **STMICROELECTRONICS N.V.'S** |
|            **Plaintiffs,** | **COMPLAINT FOR:** |
| 20   vs. | (1)   **UNLAWFUL ACQUISITION IN** |
| |       **VIOLATION OF SECTION 7 OF THE** |
| 21   **Avago Technologies U.S. Inc.;** |       **CLAYTON ACT, 15 U.S.C. § 18;** |
|      **Avago Technologies Limited; Avago** | (2)   **MONOPOLIZATION IN VIOLATION OF** |
| 22   **Technologies ECBU IP (Singapore)** |       **SECTION 2 OF THE SHERMAN ACT, 15** |
|      **Pte. Ltd.; and Avago Technologies** |       **U.S.C. § 2;** |
| 23   **General IP (Singapore) Pte. Ltd.,** | (3)   **ATTEMPTED MONOPOLIZATION IN** |
| |       **VIOLATION OF SECTION 2 OF THE** |
| 24           **Defendants.** |       **SHERMAN ACT, 15 U.S.C. § 2; and** |
| 25 | (4)   **UNLAWFUL &/OR UNFAIR** |
| |       **COMPETITION IN VIOLATION OF CAL.** |
| 26 |       **BUS. & PROF. CODE §§ 17200** *et seq.* |
| 27 | **DEMAND FOR JURY TRIAL.** |

28

                                                -1-                        COMPLAINT

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Plaintiffs STMicroelectronics, Inc. and STMicroelectronics N.V., by and through their

2    attorneys, complain against Avago Technologies U.S. Inc., Avago Technologies Limited, Avago

3    Technologies ECBU IP (Singapore) Pte. Ltd., and Avago Technologies General IP (Singapore)

4    Pte. Ltd. (collectively "Defendants"), and allege as follows:

5                                         **PARTIES**

6         1.    Plaintiff STMicroelectronics, Inc. ("STI") is a corporation organized and existing

7    under the laws of the State of Delaware with a principal place of business in Carrollton, Texas.

8    Among other products, STI imports and sells within the United States optical navigation sensors.

9         2.    Plaintiff STMicroelectronics N.V. ("STNV") is a Netherlands corporation with a

10   principal place of business at 39, Chermin du Champ-des-Filles, 1228 Plan-les-Ouates, Geneva,

11   Switzerland.  STNV is the parent company to a multinational group of companies and conducts

12   its operations through its direct and indirect subsidiaries.

13        3.    STI is an indirect wholly-owned subsidiary of STNV (together "STMicro").

14        4.    On information and belief, Avago Technologies U.S. Inc. ("Avago U.S.") is an

15   entity organized and existing under the laws of the State of Delaware with its headquarters in San

16   Jose, California.

17        5.    On information and belief, Avago Technologies Limited ("Avago Limited") is an

18   entity organized and existing under the laws of Singapore with co-headquarters in San Jose,

19   California and Yishun, Singapore.  Avago Limited is the successor-in-interest to the

20   Semiconductor Products Group of Agilent Technologies, Inc. ("Agilent") which is itself the

21   successor-in-interest in part to Hewlett Packard Corporation ("HP").

22        6.    On information and belief, Avago Technologies ECBU IP (Singapore) Pte. Ltd.

23   ("Avago ECBU") is an entity organized under the laws of Singapore with its headquarters in

24   Yishun, Singapore.  Avago ECBU is the owner of several patents and is a party to several cases

25   filed in the United States and this District that are at issue in this case.

26        7.    On information and belief, Avago Technologies General IP (Singapore) Pte. Ltd.

27   ("Avago General") is an entity organized under the laws of Singapore with its headquarters in

28   Yishun, Singapore.  Avago General is the owner and assignee of several patents, including United

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    States Patent No. 6,172,354 (the "'354 Patent"), and is a party to several cases filed in the United

2    States and this District that are at issue in this case.

3        8.      On information and belief, Avago U.S., Avago Limited, Avago ECBU and Avago

4    General are affiliated entities operating under common ownership and control and will be

5    collectively referred to herein as "Avago."  Avago is the successor-in-interest through divestiture

6    of Agilent.

7        9.      Avago designs, manufactures and sells optical navigation sensors suitable for use in

8    optical mice and other electronic devices.  On information and belief, Avago markets and sells

9    optical navigation sensors alone or that are incorporated into end-user products that are sold in the

10   United States and within this District.

11                              **NATURE OF CLAIMS**

12       10.     These claims arise from Avago's illegal, predatory and anticompetitive conduct in

13   the market for optical navigation sensors including those sensors optimized and marketed for use

14   in optical mice, the emerging applications market for optical navigation sensors suitable for use in

15   optical finger navigation modules ("OFN") and related technology markets (collectively, the

16   "Markets").  Avago's illegal, predatory and anticompetitive scheme to monopolize the Markets

17   includes the following:  (a) Avago's efforts to eliminate or limit competition through a variety of

18   anticompetitive collaborations, alliances and agreements, including an express horizontal

19   agreement not to compete; (b) Avago's history and pattern of repeatedly threatening and/or filing

20   vexatious, baseless and/or premature litigation without regard to merit and with the real purpose

21   and intent being to disadvantage competitors and to delay, exclude or foreclose competition; (c)

22   Avago's concerted and systematic campaign to chill marketplace competition, displace sales and

23   prevent actual and potential competition through false and misleading statements and omissions;

24   (d) Avago's patent accumulation activity, including its illegal acquisition of what Avago believes

25   to be a historically significant, allegedly fundamentally enabling patent from Microsoft that

26   Avago acquired with the specific intent and effect of foreclosing competition; and (e) its refusal

27   to license its patents, including its illegally acquired '354 Patent, except perhaps on

28   anticompetitive terms.

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

11.    Through these actions, Avago has sought to acquire and to maintain an illegal monopoly in the Markets and has used its dominant market power to exclude competitors and foreclose potential competition to the detriment of optical mice, mobile phone and electronic device manufacturers, purchasers, consumers, and actual and potential competitors—including STMicro.

12.    Over the past decade, Avago has been and remains the dominant player in the broader optical navigation sensor market and in each of the application markets. Avago's share of optical mouse navigation sensors is currently estimated to be 70-80%. As consumer demand has shifted towards smaller and more portable electronic devices, the need for smaller navigational input devices (using miniaturized, flipped optical navigation mouse sensors) has similarly evolved. Optical finger navigation has now emerged as the input mechanism of choice for many consumers and device manufacturers, particularly for SmartPhones and similar handheld applications. On information and belief, in a few years, almost 25% of the more than one billion cellular handsets sold each year will have an OFN module. As a result of its anticompetitive conduct, Avago has been able to exclude actual and potential competitors and is presently believed to have a 99% share of the market for OFNs.

13.    Having launched its first optical navigation sensor product in 1999, Avago enjoyed several years of complete market dominance before its position was challenged by emerging competition. Rather than compete on the merits, Avago acted quickly and aggressively to quash this competition through a variety of incentives and coercive tactics and has continued that conduct to the present.  Beginning in about 2002, as PixArt, Avago's first significant competitor, began to successfully compete, Avago began threatening competitors—and customers—with litigation. On information and belief, Avago has proceeded to sue or threaten to sue virtually every significant provider of optical navigation sensors for mice and OFN applications—including PixArt, Elan, STMicro, and SunPlus—and has brought claims against direct and indirect purchasers and market participants such as CompUSA, EM Microelectronics, Microsoft, RIM, CrucialTec, Partron, Mitsumi, BYD, and Vista Point. Its efforts have been aggressive and multifaceted with some competitors having been sued multiple times and/or in circumstances

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1 clearly timed and pursued so as to intimidate and to obtain an unfair advantage.  Thus, after years

2 of litigation with Avago, Avago's lawsuit against PixArt in the United States was ultimately

3 resolved through settlement and license (the "Settlement and License") only after Avago filed suit

4 against PixArt in Taiwan—on the very day PixArt first started trading on the Taiwanese OTC

5 market (collectively, "PixArt I").  Notably, despite years of litigation, threats and intimidation,

6 not a single one of these cases has resulted in a final ruling on the merits in favor of Avago.

7   14. Avago's market intimidation and disciplinary action has been relentless.  It has

8 attempted to leverage its litigation activities and threats to the broader market through one-on-one

9 customer meetings, market "notification" letters, press releases and website coverage.

10 Commencing in or about 2005 and continuing to the present, Avago's main optical sensor

11 webpage has contained a statement regarding Avago's aggressive litigation efforts with links to a

12 webpage dedicated to providing a misleading account of its litigation-related efforts—punctuated

13 with press release "updates."  Titled: "Avago Technologies Defends its Intellectual Property" and

14 available in several languages and/or on several foreign country domains, Avago has sought to

15 use these communications to create fear and uncertainty in the minds of potential purchasers in

16 the United States and abroad.  Significantly, however, Avago ceased updating this marketing

17 page after several significant decisions adverse to Avago were handed down in its litigation with

18 competitors.  For example, in January of 2009, one of its competitors, Elan, obtained summary

19 judgment of dismissal of one of Avago's asserted patents; in May of 2009, Elan obtained a jury

20 decision of non-infringement.  Yet, Avago's webpage contains no reference to the current status

21 of the Elan litigation or the adverse jury verdict.  While that case now awaits a re-trial, on

22 information and belief, Avago has intentionally chosen not to update its webpage so as to mislead

23 customers, through false and misleading statements and omissions regarding the status of its

24 litigation efforts and the scope of its intellectual property rights.

25   15. Avago has also sought to exclude actual or potential competitors from the Markets

26 by offering improper incentives and inducements in order to dissuade them—explicitly or

27 implicitly—from aggressive competition.  SunPlus is an example of such an explicit improper

28 non-compete agreement.  Shortly after SunPlus began offering optical mouse sensors, Avago

1   negotiated an agreement with SunPlus whereby the parties would collaborate on next generation

2   mouse solutions with SunPlus focusing on microcontrollers and Avago on optical sensors.  As

3   announced by the parties in their press release, under the specific "terms of the agreement,

4   SunPlus will redirect its PC optical mouse sensor development to focus on the joint development

5   engagement with [Avago]."  On information and belief, the net effect of SunPlus' agreement to

6   "redirect" its optical mouse sensor development efforts and focus on microcontrollers was to

7   eliminate SunPlus as a competitor of optical navigation mouse sensors in the optical sensor

8   market during the term of the agreement.

9        16.    Avago's focus on STMicro's early optical mouse sensor efforts and its acquisition of

10   what Avago considers to be a key industry patent from Microsoft (the '354 Patent) is indicative of

11   its more indirect efforts to impair competition.  STMicro has long supplied custom optical mouse

12   sensors to Microsoft.  Due to a preexisting license between Microsoft and Avago's predecessors,

13   STMicro, as Microsoft's supplier and sublicensee, was immune from Avago's coercive activities.

14   However, when STMicro turned its attention to the marketing and sale of its optical sensor

15   products to customers other than Microsoft, Avago attacked.  Upon learning that STMicro had

16   reached an agreement with Microsoft to allow it to begin producing and selling the custom optical

17   sensor products to third parties, Avago approached Microsoft and, at the last minute, caused

18   Microsoft to withdraw from the agreement, thereby significantly delaying STMicro's entry into

19   the market.  In an effort to enhance its ability to exclude competitors, Avago thereafter acquired

20   the '354 patent from Microsoft—the same patent that it has now asserted against STMicro in a

21   lawsuit pending in the Eastern District of Texas and which Avago has threatened to use against

22   other market participants.  Assuming the '354 patent is valid and reads as broadly as Avago

23   believes, Avago's purchase of this patent from Microsoft substantially lessened competition in the

24   Markets and substantially changed the competitive landscape.

25        17.    As the market has moved toward OFN, Avago has renewed its anticompetitive

26   campaign and is attempting to use this normal market evolution to recapture market share and

27   reassume complete market dominance, thereby precluding consumer choice and the benefits of

28   free competition.  Thus, in September 2009, Avago asserted, for the first time, that the Settlement

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

1    and License previously granted to PixArt in connection with PixArt I, did not extend to OFN

2    applications. Avago made this assertion despite the fact that, on information and belief and

3    pursuant to the pleadings of the parties: (1) the Settlement and License specifically identified

4    generic navigation sensor patents, mouse patents and OFN-specific patents as being covered by

5    the license and (2) PixArt had paid royalties, for PixArt's sales of OFN products. Intent on

6    preserving its virtual lock on the market for OFN and emboldened by its enhanced market power

7    and acquisition of the '354 Patent from Microsoft, Avago has refused to concede and license

8    PixArt—or any OFN competitor—choosing instead to force the launch of new litigation

9    including a lawsuit with PixArt that is presently pending ("PixArt II"). Notably, as with Avago's

10   earlier media efforts, its campaign against PixArt was accompanied by direct and indirect market

11   communications and press releases clearly aimed at establishing Avago's predominance and

12   sowing fear and uncertainty in the market.

13         18.     On January 6, 2010, Avago published an open letter to the OFN market (the "OFN

14   Market Letter") announcing its large patent portfolio, including the illegally acquired '354 Patent

15   and stated "Avago has not directly licensed its OFN patent portfolio to other sensor manufacturers

16   and we will take aggressive actions to protect our IP rights against any infringement." It thereafter

17   engaged in a series of further press releases and market communications aimed at chilling the

18   market and preventing entry into the OFN market. PixArt II was filed only a month later, on

19   February 8, 2010.

20         19.     Avago's next OFN-related litigation target was STMicro. STMicro introduced an

21   OFN sensor (referred to by STMicro as an optical joystick sensor) with significant technological

22   advantages (smaller die, improved navigation, better matching) and at a significantly lower price

23   point on March 9, 2010. Intent on interfering with STMicro's ongoing negotiations with a

24   previously captive large OFN customer, but lacking any evidence of OFN-related infringement,

25   Avago filed suit just days later naming one of STMicro's older optical mouse sensor products (a

26   product with less than $4,000 in United States mouse sales in the last three years) and falsely

27   described the lawsuit as being directed to OFN. On information and belief, Avago lacked any

28   basis to identify any chargeable OFN application in the United States that used an ST optical

COMPLAINT

1    navigation chip at the time it filed suit.  Indeed, even as of the date of this filing—and as Avago is

2    seeking leave to supplement its infringement contentions to add even more claims—Avago has

3    not been able to identify a single third-party OFN application actually using an STMicro optical

4    navigation chip in the U.S. and thus subject to the United States patent laws.

5         20.    Notably, Avago filed the lawsuit with no prior communications or discussions with

6    STMicro.  Instead it chose to maximize its effect on the broader market and issued an

7    accompanying press release aimed at:  a) deterring actual or potential customers from purchasing

8    sensors for OFN applications from STMicro or other actual or potential competitors; and b)

9    intimidating and warning other actual or potential competitors from entering the market.  On

10   information and belief, to the extent that Avago intends the lawsuit to accuse OFN applications in

11   the United States, Avago filed the lawsuit prematurely and without any reasonable basis in fact so

12   as to cause customers to purchase OFN modules from Avago rather than STMicro and without

13   regard to the merits of its claim as they relate to OFN applications.  At least in part through these

14   tactics, Avago was able to convert a $40 million purchase of OFN sensors to its own account.

15        21.    Avago has used its dominant and monopoly power to engage in predatory,

16   exclusionary and anticompetitive actions that, taken as a whole, have had the purpose and effect

17   of foreclosing competition and preventing the entry of competitors in the Markets.

18                              **JURISDICTION AND VENUE**

19        22.    STMicro seeks injunctive and compensatory relief pursuant to the Sherman Act, 15

20   U.S.C. § 1, Sherman Act, 15 U.S.C. § 2, and the Clayton Act, 15 U.S.C. § 18.  This Court has

21   subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.  Pursuant to 28 U.S.C.

22   § 1332, jurisdiction is proper in this Court because this action is betweens citizens of a state and

23   citizens or subjects of a foreign state where the amount in controversy exceeds the jurisdictional

24   minimum.

25        23.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c).

26        24.    Pursuant to Civil Local Rule 3-5 and 3-2(c), Intradistrict Assignment is proper in

27   the San Jose Division of this Court because on information and belief Defendant Avago U.S. has

28   its principal place of business in Santa Clara County and, on information and belief, a substantial

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

1    part of the events or omissions which give rise to the claims alleged herein occurred in Santa

2    Clara County including without limitation the PixArt I, PixArt II, and Elan lawsuits, all of which

3    were filed in the San Jose Division of this Court.

**BACKGROUND**

5       25.    STMicro repeats and realleges each of the allegations above as if fully set forth

6    herein.

7    **Optical Navigation Technology and Products**

8       26.    Optical navigation technology involves the use of light reflected off of a surface

9    onto an optical sensor that uses the light images to track movement. Such technology measures

10   change in position by optically acquiring sequential surface images (frames) and mathematically

11   determining the direction and magnitude of movement.

12      27.    An optical navigation sensor (or chip) is comprised of a bare die set in silicon and

13   associated electronic circuitry that together receive the light signals and convert them into

14   electronic images. Optical navigation sensor providers generally offer the sensor as a stand alone

15   product or packaged in a housing unit. Sensors are typically sold to component providers who

16   then combine the chips with other components into a housing unit and sell the resulting module to

17   the ultimate manufacturer (*e.g.,* the mouse manufacturer or the handset manufacturer).

18      28.    Optical navigation sensors are used in external or internally integrated navigation

19   devices to control a pointer on a computing device. The original and most prevalent application

20   is an external computer mouse. In a typical configuration, optical mice contain, among other

21   components, a light source and an optical navigation sensor in the mouse that operate together to

22   bounce the light off of the surface upon which the mouse moves, track patterns in the images the

23   light reflects, detect movement from the prior image, and use the changes in pattern to control the

24   motion of the cursor on the computer. The light sources used in optical mice can include a light

25   emitting diode ("LED") or infrared laser diode.

26      29.    Early versions of computer mice used external track-ball units to track movement of

27   the mouse on a mouse-pad to direct the cursor on the computer screen. Optical navigation

28

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

1   sensors were first introduced in external mice in the late 1990s and have since all but replaced

2   track-ball units as the mouse navigation option of choice for OEMs and consumers.

3        30.   Optical navigation units have several benefits over "mechanical" units such as

4   mechanical mice that use track-balls or an equivalent for navigation.  For example, mechanical

5   mice require use of a mouse-pad and generally are unable to track on glossy or transparent

6   surfaces.  Optical mice, by contrast, operate on virtually any surface, thereby eliminating the need

7   for a mouse pad.  As compared to both external and internally integrated devices, optical mice

8   can capture one thousand successive images or more per second, which results in higher precision

9   navigation, pointing and movement over mechanical mice.  Further, because optical mice have no

10  ball or cavity, no cleaning is necessary, making them more reliable and longer lasting.  In

11  addition, optical mice use fewer moving parts, which results in less wear and tear on the device, a

12  lower chance of failure, and fewer access points for fluids or materials to interfere with the

13  tracking sensors.  External mice have evolved and now are available in various configurations and

14  under different nomenclature including "mice," "joysticks," "trackballs" and 5 way rocker

15  switches, all of which are used to control the pointer on the screen.

16       31.   As computer devices have evolved to smaller more portable devices, navigation

17  systems have similarly evolved.  Thus, rather than an external mouse, many PC's (and other small

18  electronic devices) use internally integrated or embedded pen mice, trackballs, 5 way rocker

19  switches or trackpads and other devices to control the cursor on the screen.

20       32.   Just as optical navigation devices followed the older mechanical tracking devices

21  into consumer electronic products, with further development optical navigation units such as OFN

22  units (also known as optical joysticks, pseudo trackballs, optical trackballs, optical navigation

23  pads, optical trackpads and optical finger mice) are likewise following the trend toward internal

24  integration of the navigation units into consumer electronic products.  Initially used in limited

25  applications for notebook PCs, Ultra Mobile PCs (*e.g.*, Windows Tablet PC) and PDAs, the OFN

26  application market has now evolved into new applications for use in mobile phones, remote

27  controls, MP3 Players, Game Pads, digital cameras and other small, devices that require precision

28  navigation in a small space.  Whereas the optical sensor in a mouse moves over the top of a

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-10-

1  surface, the optical navigation sensor in an OFN module remains stationary and the tracking

2  surface (*i.e.*, the finger) moves on top of the sensor.

3      33.    With the advent of the 3G cell phone and 4G/SmartPhone markets, the OFN

4  application market is growing rapidly.  As Avago has asserted, "[s]ince 2007, all major cell phone

5  manufacturers have begun to replace 5-way rocker switches and trackballs with OFN solutions.

6  With the successful adoption of OFN, manufacturers are now shipping millions of cell phone and

7  other handheld electronic devices to customers throughout the world with this innovative

8  technology." (January 05, 2010 Avago Press Release).

9  **The Parties' Optical Navigation Sensor Products**

10      **Avago's Optical Navigation Sensor Products**

11      34.    Avago, through its predecessors Hewlett Packard and then the Semiconductor

12  Product Group of Agilent, claims to have "pioneered optical sensing for mouse technology" when

13  it introduced the first optical navigation sensor for use in optical mice in 1999.  Since then, Avago

14  has been the dominant supplier of optical navigation sensors to component providers and optical

15  mice manufacturers worldwide.  Indeed, Avago represents that it is "the leader of optical mice

16  sensor technology" and that optical mice powered by its optical sensing technology are "the

17  standard in computer input devices."  By the end of 2006, Avago supplied manufacturers with

18  enough optical mouse sensors to provide an optical mouse to every citizen living in the United

19  States, Japan, Malaysia, Germany and France.  As of mid-2007, Avago shipped over 700 million

20  optical navigation sensors for use in optical mice to optical mice manufacturers worldwide.  By

21  2010, Avago claimed to have shipped a combined total of over a billion optical navigation

22  sensors to a wide range of global customers.

23      35.    Recognizing the strength of its installed base, Avago instituted a "Powered by

24  Avago" branding program.  On information and belief, this program was instituted with the intent

25  and effect of erecting a further barrier to entry to actual and potential competitors.

26      36.    Avago offers its navigation sensors for optical mice as stand alone chips or

27  packaged in housings, and as part of sample and designer kits.  Mouse kits may include a variety

28  of component parts needed to develop and/or manufacture all or part of an optical mouse or other

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

navigation unit and may include the sensor, a microcontroller, lens plates and related hardware and software. Avago offers specific reference design kits for integration with a variety of third party microcontroller providers including Cypress, SunPlus, and Holtek.

37. Throughout 2005 to 2006, Avago created more refined demos of small OFN units using its miniaturized mouse sensors focusing on emerging ultra mobile PC and PDA applications. Coinciding with the introduction of 3G cell phones and the related increase in demand for handheld applications, in or around 2007, Avago introduced an OFN module targeted at mobile phone applications.

38. Avago ramped up production in 2009 and, in January 2010, Avago introduced a new optical navigation sensor for use in OFN applications. Avago has described its optical navigation sensor product for an OFN module as an "inverted," "miniaturized" version of its earlier optical navigation sensors for optical mice but with "a cap on it" so that "your finger then becomes the desktop." In a press release dated January 5, 2010, Avago stated that it's "OFN solution is user-friendly and targets designers of electronic devices such as mobile phones, MP3 Players, Ultra-Miniature PCs, Game Pads, Digital Cameras and keyboards."

39. Avago has announced that it has approximately 70-80% share of the optical mouse sensor market. PixArt is Avago's next closest competitor followed by Elan, STMicro and others that each hold less than 5% market share. On information and belief, Avago currently supplies at least 99% of all OFN applications.

**Avago's Patent Portfolio**

40. Avago has a broad patent portfolio which it claims includes hundreds of optical navigation sensor patents and more than 30 OFN-related patents. The majority of these patents are directed to integrated devices such as optical mice that are not manufactured by Avago or its optical navigation sensor competitors. Few of Avago's asserted patents are directed solely to the optical sensors themselves as opposed to the products or applications in which such sensors are used. As a result, Avago's patent portfolio, while extensive, is not as strong or as broad as it represents to customers or its competitors, particularly with regard to OFN sensors or other internally embedded sensor applications.

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

41.     Avago's patent portfolio is similarly limited by its extraterritorial reach and contains relatively few foreign patents.  On information and belief, Avago's foreign patent portfolio protections are significantly less than that afforded its products in the United States. Additionally, the protection afforded by its United States patent portfolio is limited by its extraterritorial reach.

**STMicro's Optical Navigation Sensor Products**

42.     STMicro first began selling optical navigation sensors for mice in 2001, selling custom optical mice sensors exclusively to Microsoft.  Microsoft, in turn, incorporated the sensors into its IntelliMouse® optical mice family of products which were then sold to customers directly and through distributors and at retail.  This relationship has continued to this day with ongoing sales of sensors for use in Microsoft's optical mouse products.  Over time, Microsoft has diversified to include providers of optical sensors other than STMicro and, more recently, has chosen to design its own sensors and outsource the manufacture of those optical sensors to semiconductor foundries and/or third party suppliers.

43.     As Microsoft's outsourcing strategy and business model evolved, STMicro decided to expand its sales of optical sensors to the broader market.  Its first effort to supply optical sensors to the broader market involved an effort to sell existing Microsoft chip to third parties. After approaching Microsoft, the parties reached an agreement whereby STMicro would sell the custom chip, code named "Expedition," to third parties.  STMicro then approached Samsung Electro Mechanics Co. Ltd. ("SEMCO") and other customers regarding the supply of such products by STMicro.  Its efforts were quickly thwarted.  Upon learning of STMicro's entry into the broader market, Avago approached Microsoft and convinced Microsoft to withdraw from the deal with STMicro.  STMicro in turn was forced to cease its efforts to supply SEMCO and other customers with these products.  Recognizing the adverse impact of this abrupt reversal, Microsoft flew with STMicro to Korea to convey its apologies to SEMCO.  Avago's interference with STMicro's collaboration with Microsoft and its pending deal with SEMCO threatened its business relationship with other potential purchasers of optical sensor products and delayed STMicro's entry into the market.

COMPLAINT

44.    Faced with this set back, STMicro then began developing a new standard optical mouse sensor for sale to third parties. STMicro ultimately launched a new optical navigation sensor product and first began selling to customers other than Microsoft in late 2005 and 2006. In contrast to the favorable reaction STMicro had obtained years earlier from SEMCO and others, by that point Avago's interim marketing campaign and other anticompetitive conduct had positioned Avago as the only "safe" supplier in the market and caused considerable fear and trepidation with customers. Customers advised STMicro that, based upon their discussions with Avago, they feared that they may be Avago's next target or that Avago—the dominant provider of both sensors and related handset components such as RF duplexers—would not sell to them if they purchased such products from STMicro. As a result of Avago's efforts, STMicro's sales of standard optical mouse sensors have been limited.

45.    STMicro subsequently developed the VT53XX family of high-performance, small form factor sensor products including the VT5366, designed to give customers a complete offering of optical navigation sensor options. STMicro's VT53XX family of sensor products has competed and compete directly with the optical navigation sensors that are sold by Avago.

46.    In late 2007, STMicro published a data sheet for its VT5376 sensor—an ultra-low power integrated optical navigation sensor.

47.    Customer demand for small optical navigation sensors suitable for use in OFN applications continued to increase, prompting STMicro to explore repositioning the VT5376 product for use in OFN applications such as mobile phones and other small, handheld electronic devices. As the VT5376 was technically capable of meeting the standards for OFN applications (precision navigation, small form factor), the principal issue confronting STMicro was understanding the new application environment. STMicro began exploring and discussing repositioning of the VT5376 for OFN application in late 2009, but did not publicly advertise the product for use in an OFN applications until March 2010.

48.    The VT5376 sensor competes directly with Avago's OFN solution.

49.    STMicro's VT5376 optical navigation sensor has numerous technological benefits over the OFN sensors offered by Avago. Due to the often small navigation foot print in handheld

COMPLAINT

1   devices, the size of the chip is a significant factor in customer purchasing decisions. STMicro's

2   chips are smaller than Avago's chips. Technical capabilities, such as faster frame rate and higher

3   accuracy are also significant factors to OFN and other customers. STMicro's VT5376 sensor

4   offers better technical performance than existing Avago units. Power supply and consumption is

5   a significant factor to cellular handset manufacturers so as to increase batter life and decrease

6   size. Yet again, the performance of the VT5376 sensor is better than the competing Avago chips,

7   requiring less power when operating. Finally, the VT5376 costs less than Avago's competing

8   OFN sensors (approximately 25% less).

## AVAGO'S ILLEGAL ACQUISITION ACTIVITY AND ANTICOMPETITIVE CONDUCT

**Anticompetitive Collaborations, Agreements and Interference Efforts**

50.     Avago has dominated the Markets since the release of its first optical navigation

sensor in 1999. Indeed, Avago itself represented in a December 12, 2002 press release that it

supplied optical mouse sensors to "all optical mouse manufacturers worldwide." By the end of

2003—before STMicro had even introduced its VT53XX family of products—Avago had

shipped over 200 million optical mouse sensors worldwide.

51.     Emboldened by its initial success, Avago has not been content to compete on the

merits. When faced with emerging competition, Avago commenced what has become a history

and pattern of conduct designed and intended to restrict competition, maintain its monopoly

position and exclude or foreclose competitors from the Markets. Beginning with its attacks in

2003 on the initial optical mouse entrants, Avago has threatened and/or sued customers and

competitors (often leading to prompt capitulation of those unwilling or unable to bear costly

litigation), tied up PixArt and Elan in time consuming and expensive patent litigation, intervened

to prevent STMicro's collaboration with Microsoft, thereby delaying its entry, removed SunPlus

as a potential sensor competitor through a facially anticompetitive collaboration and contract and

acquired the '354 Patent from Microsoft in order to further enhance and enable its anticompetitive

conduct. Most recently, with its recognition of the even greater opportunities afforded by the

small electronics market and the use of optical navigation sensors in OFN applications, Avago

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

1    has acted aggressively to preclude competition by "reinterpreting" its Settlement and License with

2    PixArt and using its market power and patent portfolio—including the illegally acquired '354

3    Patent—to foreclose competition and protect its valuable monopoly.

4          **SunPlus Agreement Not to Compete**

5          52.    Avago has applied pressure directly and indirectly in an effort to prevent

6    competition. As mentioned, Avago's agreement with SunPlus Technology, on its own and

7    through its wholly owned subsidiary SunPlus Innovation Technology (together "SunPlus"), a

8    Taiwanese consumer electronics and semiconductor company, is an example of an explicit illegal

9    non-compete agreement. SunPlus entered the market for optical sensors for optical mice in or

10   about 2004. Rather than compete on the merits of the parties' respective products, Avago

11   convinced SunPlus to collaborate with it and to "redirect" its development efforts away from

12   optical sensor products to the development of microcontrollers to be used in chips and bundled

13   optical mouse reference design products and kits. As announced by the parties, under the specific

14   "terms of the agreement, SunPlus will redirect its PC optical mouse sensor development to focus

15   on the joint development engagement with Agilent."

16         53.    During the course of the relationship, Avago introduced several reference design

17   kits using Avago optical sensors and SunPlus microcontrollers including, without limitation, the

18   ADNK-6003-SP01, the ADNK- 5023-SP02 and the ADNK-7553-SP11. The resulting

19   introduction and sale of each reference design kit containing an Avago optical sensor and SunPlus

20   microcontroller is a separate overt act in furtherance of their anticompetitive collaboration and

21   agreement. On information and belief, the last such reference kit was introduced on or about July

22   2008, at which time Avago and SunPlus appeared to have reached a disagreement over their

23   arrangement. On information and belief, no product resulting from further collaboration efforts

24   has been introduced to the market although the kits continue to be sold. Instead, in or around

25   August 2008, Avago immediately accused its former collaborator SunPlus of patent infringement.

26   According to SunPlus' most recent securities filing, no such suit has yet been filed. Most tellingly,

27   on information and belief, SunPlus has not resumed any vigorous development or sale of optical

28   sensors since entering into its collaboration and agreement with Avago.

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

54.     The net effect of this agreement was to eliminate competition from SunPlus as a provider of competitive optical mouse sensor products and technology during the term of its purported collaboration with Avago and to increase Avago's share of and dominance in the Markets. As a blatant noncompete, the agreement with SunPlus could have no redeeming benefit.

55.     Given Avago's dominant market position and the lack of available competition, the agreement was particularly anticompetitive—namely eliminating all competition between Avago and one of only a handful of new Market entrants. Such anticompetitive effects include but are not limited to a lack of competition on the merits which would likely have resulted in greater innovation and development of better products at lower prices to the benefit of manufacturers, component providers and consumers in the United States and abroad. Conversely, there is no reasonable basis or procompetitive effects achieved by Avago insisting that SunPlus cease conducting optical mouse navigation sensor development and sales to focus exclusively on microcontroller development. Avago and other companies routinely work with microcontroller companies to produce reference design kits without such clearly anticompetitive terms. Moreover, SunPlus is a relatively large company and, on information and belief, had sufficient resources to support its optical navigation sensor effort. Further, since the engineers required for optical sensor development work are analog engineers rather than the digital or ASIC engineers needed for microcontroller work, there would simply be no justifiable reason to require the "diversion" of resources that in fact could not be reasonably diverted.

**Interference with STMicro's New Optical Mouse Sensor Product Launch**

56.     Another example of Avago's anticompetitive conduct is its effort to prevent STMicro from offering optical mouse sensors to third parties in competition with it. As discussed above, upon learning of STMicro's imminent entry Avago approached Microsoft, STMicro's partner in introducing a new optical navigation sensor to the market, and induced Microsoft to withdraw from its negotiated deal with STMicro. In view of the relative balance of patent power held by the parties at the time, including the previously negotiated patent license, on information and belief, Avago's interference was improper, included unfair and/or inappropriate incentives and constituted an abuse of monopoly power.

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

57. On information and belief, Avago's interference with the STMicro/Microsoft collaboration and the aborted launch of STMicro's optical mouse sensors to the broader market was part of its monopoly scheme, which has included but is not limited to Avago's subsequent acquisition of the '354 Patent and its recent assertion of that patent against STMicro which has interfered with STMicro's market efforts and caused injury to STMicro.

58. On information and belief, Avago has entered or attempted to enter into other agreements with actual or potential competitors and other market participants to limit competition in the Markets and increase Avago's share and dominance in the Markets.

**Acquisition of the '354 Patent**

59. Not content with having directly interfered with STMicro's initial efforts to compete, Avago sought to leverage its power in the Markets through acquisition of the '354 patent from Microsoft. In 2006 and 2007, Microsoft and Avago executed an assignment of the '354 Patent to Avago which was filed with the United States Patent Office on January 11, 2007. Avago selected just one—the '354 Patent—from the more than 10,000 patents owned by Microsoft, thereby highlighting the perceived importance of this patent to Avago's patent portfolio and enforcement efforts. In addition to having more foreign counterparts than several of the other patents that Avago has asserted, the '354 patent has been used by the USPTO to narrow or prevent the issuance of other patents in the field, including patents issued or sought to be issued by Avago.

60. On information and belief, Avago acquired the '354 Patent in part because Avago interprets its scope broadly to cover both optical mouse and OFN devices such that Avago could deem it to be fundamentally enabling in the Markets. Indeed, the '354 patent is only one of a few patents that Avago has specifically cited to customers as enabling it to foreclose competition in OFN applications (*See, e.g.,* January 2010 Notice letter). The '354 Patent is also important to enhancing Avago's market position because of its significantly broader geographic reach through foreign counterparts then other patents owned by Avago. As mentioned, Avago has not aggressively pursued foreign filings until recently and, by way of example, of the five patents currently asserted against STMicro in the Eastern District of Texas, only the '354 Patent and one

1  other patent have any foreign counterparts. Notably, the foreign counterparts of the other patent

2  do not appear to reach the most significant Asian markets, Taiwan and Korea. As such, the '354

3  Patent provides Avago with greater power to threaten customers and competitors and attempt to

4  prevent competition in the Markets.

5       61.    STMicro disputes that the '354 Patent is valid and reads as broadly as Avago

6  maintains. If the '354 Patent is held to be valid, and Avago's construction of the '354 Patent

7  prevails, however, the effect of that patent's acquisition from Microsoft was to consolidate the

8  core technology that underlies all optical navigation sensors used in optical mice *and* OFN

9  applications and to provide Avago with even greater and more dominant market power which it

10  has used and will continue to use to exclude and foreclose competitors. On information and

11  belief, the acquisition was not subject to pre-merger review by the Department of Justice or the

12  Federal Trade Commission.

13  **Repetitive, Vexatious, Baseless and Premature Litigation and Threats of Litigation.**

14       62.    On information and belief, Avago has asserted infringement and/or litigated against

15  virtually every significant competitor and market participant in the industry with whom it has not

16  otherwise collaborated. It has been involved in three separate cases with PixArt, two cases with

17  Elan, one pre-litigation settlement with CompUSA, one apparent threatened litigation against

18  Microsoft aimed at preventing its collaboration with STMicro, a separate trade secret claim

19  against Microsoft aimed at its optical navigation products, and a case against EM

20  Microelectronics. Avago has also threatened patent litigation against SunPlus, sued STMicro

21  (under the pretext of preventing OFN sales when the only products that it was able to accuse of

22  direct infringement were optical mouse applications), and asserted countless threats of litigation

23  against other direct and indirect customers such as CrucialTec, Vista Point, RIM, Partron,

24  Mitsumi and others. On information and belief, STMicro asserts that there are many more threats

25  and potential litigation not yet known to STMicro that will be revealed through discovery.

26  However, with over 15 case filings, settlements or threats of litigation and not a single successful

27  decision on the merits, it is apparent that Avago is using litigation and threats of litigation as an

28  anticompetitive tool and is engaging in vexatious and repetitive litigation pursuant to a policy and

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

scheme of instituting litigation without regard to the merits and for the purpose of injuring and preventing competition.

### CompUSA Settlement and PixArt Litigation (PixArt I)—United States (NDCA) and Taiwan

63.     PixArt is a Taiwanese corporation that designs, develops and markets low-cost, high-quality CMOS (complementary metal oxide semiconductor) sensors for a variety of applications.  Its product line includes optical navigation sensors that are suitable for use in a variety of handheld devices including, without limitation, optical mice and mobile phones.  On information and belief, PixArt sells its optical navigation sensor products in the United States and overseas to OEMs and others, who incorporate them into a variety of devices that are then sold to retailers and end users.

64.     In or about 2002, PixArt introduced its first optical sensor to the market.  By 2003, PixArt was actively selling optical navigation sensors for use in optical mice that competed directly with Avago's optical navigation sensors for the same application.  At that time, CompUSA was one of the largest United States retailers of optical mice.  CompUSA purchased optical mice that used PixArt's optical navigation sensors to resell to consumer purchasers.

65.     In the summer of 2003, on information and belief, Avago threatened CompUSA with potential litigation or loss of supply if it continued to sell optical mice that contained non-Avago sensors or non-Avago licensed sensors.  Avago made these threats with the purpose and intent to force CompUSA—PixArt's largest United States customer for optical navigation sensors—to cease selling any optical mice that contained PixArt sensors.  And recognizing that a retailer would not have the same incentive to defend, Avago sought to obtain a quick settlement that it could—and did—announce to the broader market to chill competition and perhaps force PixArt to a quick settlement forcing its departure from the market.  Pursuant to the press release issued by Avago to announce the resolution of the parties' dispute, "[u]nder the terms of the agreement, CompUSA will discontinue sales of optical mice based on the unlicensed technology."  On information and belief, in light of Avago's direct threat of costly and protracted

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   litigation, CompUSA agreed to stop purchasing optical mice containing optical sensors from

2   PixArt without any significant analysis of the merits.

3         66.    Contemporaneously with its announcement of a settlement with CompUSA, Avago

4   asserted that PixArt was infringing U.S. Patent No. 6,433,780 (the "'780 Patent") entitled "Seeing

5   Eye Mouse for a Computer System."   Faced with losing its largest United States customer and

6   amidst broader customer concern about potential litigation from Avago, PixArt filed a lawsuit in

7   the Northern District of California, Case No. 03-CV-04871, against Avago seeking declaratory

8   relief that none of its optical navigation sensors infringed the '780 patent.  PixArt was forced to

9   file the declaratory judgment action as a result of Avago's threats to itself and to its customers.

10  Indeed, Avago has repeatedly sought to represent the litigation as exemplifying its willingness to

11  pursue litigation and has in fact claimed that "[Avago]filed suit against PixArt for infringement of

12  [Avago's] U.S. Patent No 6,433,780." http://www.avgotech.com/pages/products/intellectual/

13        67.    Avago later counterclaimed and amended its affirmative claim to assert that

14  PixArt's optical navigation sensors infringed not only the '780 Patent, but also Patent Number

15  5,686,720 ('720 Patent), titled "Method and Device for Achieving High Contrast Surface

16  Illumination," and Patent Number 5,786,804 ('804 Patent"), titled "Method and System for

17  Tracking Attitude."

18        68.    Almost three years after the initial filing, Avago filed yet another patent

19  infringement suit against PixArt in Taiwan.  On information and belief, Avago did so with the

20  purpose and intent to further chill the market by creating heightened fear among sensor customers

21  and to further pressure PixArt, not directly through the litigation but indirectly through its effect

22  on its share price and related financing opportunities.   Indeed, the filing of the Taiwanese lawsuit

23  was timed so as to coincide precisely with the day PixArt's stock first began trading on the

24  Taiwan OTC stock exchange.

25        69.    Shortly thereafter, in or about July 2006, PixArt and Avago agreed to a patent

26  license agreement to settle the United States action and several months later entered into a further

27  and related license agreement involving the Taiwanese patents.  On information and belief and as

28  described in subsequent filings of Avago and PixArt, the Settlement and License gave both

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

1  parties a cross-license to any then-issued or then-pending patents for optical navigation sensors

2  suitable for use in optical mouse products defined as optical mouse or optical trackballs that

3  control a cursor or pointer on the display screen of a computing device and track motion utilizing

4  a LED or Laser light emitting device.

5      70.    On information and belief, the license was drafted by Avago to discourage United

6  States sales of optical sensors and products incorporating such sensors through application of

7  varying royalties and other terms.

8      71.    On November 23, 2007, Avago registered the PixArt license with the Taiwan

9  Intellectual Property Office along with a list of its existing Taiwanese patents licensed under the

10  agreement.  That list included Avago's Taiwanese counterparts to two of Avago's U.S. patents

11  that have no application to traditional optical mouse applications.  (See U.S. Patent No. 6,677,929

12  ("Optical Pseudo Trackball Controls the Operation of an Appliance or Machine" and Patent No.

13  6,057,450 (Mouseless Optical and Position Translation Type Screen Pointer.").

14      72.    On information and belief, the Settlement and License was drafted to cover various

15  optical mice navigation applications including OFN.

16  **Elan Litigation—United States (NDCA) and Taiwan**

17      73.    Like PixArt, Elan Microelectronics Corporation ("Elan") is a Taiwanese

18  Corporation that manufactures optical navigation sensors suitable for use in optical mice and

19  other products.

20      74.    During its litigation with PixArt, Avago filed a separate lawsuit against Elan on

21  December 20, 2004, alleging that Elan's OM02 optical sensor products for optical mice infringed

22  the '780 Patent and the '804 Patent the same patents previously asserted against PixArt.  On

23  information and belief, Avago commenced this lawsuit with the purpose and intent to further chill

24  competition and to preclude Elan from optical mouse sensor competition.

25      75.    As with PixArt, Avago later filed suit against Elan in Taiwan in September 2006.

26  The Taiwanese lawsuit similarly alleged that Elan's sensors infringed Avago's Taiwan patent

27  number 207503, "Seeing Eye Mouse for a Computer System."

28

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

76.   After several years of litigation, in January of 2009, the United States District Court of the Northern District of California granted summary judgment of non-infringement in favor of Elan as to the '804 Patent.  Then, in May 2009, a jury returned an unanimous verdict finding that Elan's optical mouse sensor products do not infringe the '780 Patent.  The case is presently on retrial.  In the interim, on information and belief, and despite these victories for Elan, Avago's lawsuits discouraged Elan and other actual or potential competitors from entry and vigorous competition in the Markets, and discouraged actual or potential customers from purchasing optical navigation sensors from Elan, causing injury to Elan in the form of lost sales and injury to customers and consumers who were denied a choice of supply and the benefits that flow from vigorous competition.

**EM Microelectronics Litigation—United States (EDTX)**

77.   Avago has also filed suit against other market participants.  Thus, in June of 2007, Avago filed suit against EM Microelectronics-Marin S.A. alleging infringement of United States Patent No. 6,995,748 entitled "Apparatus for controlling a screen pointer with a frame rate based on velocity."  The lawsuit was dismissed by stipulation little more than six months later upon Avago's motion.  On information and belief, the lawsuit was filed to prevent competition and enhance Avago's market position in the Markets and without regard to the merits.

**Microsoft: Avago's Threat Against STMicro's Optical Navigation Product and Separately-Filed Trade Secret Litigation—United States (NDCA)**

78.   As discussed above, on information and belief and in the alternative, it appears that Avago threatened Microsoft with litigation if it assisted or participated in STMicro's initial efforts to compete and sell optical mouse sensor products to customers other than Microsoft in competition with Avago. .

79.   Later, on or about November 20, 2008, Avago filed suit against Microsoft alleging trade secret infringement relating to its retention of a former Avago Senior Research Scientist "active in the research and development of Avago's optical navigation technology, including new and innovative products and potential products for LED and laser-based optical mouse applications."  The case was dismissed by stipulation of the parties on July 29, 2009.  On

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-23-

1    information and belief, Avago filed the lawsuit for an anticompetitive purpose and to obtain a

2    competitive advantage in the Markets.

3        **PixArt II—United States (NDCA)**

4        80.   After settling PixArt I, PixArt continued to design, develop and improve upon its

5    optical navigation sensors for optical mice and optical trackballs within the scope of the

6    Settlement and License with Avago.  Those efforts included developing an optical navigation

7    sensor suitable for use in a device with an optical finger navigation, or "pseudo trackball," unit.

8    By late 2009, PixArt was ready to offer its optical navigation sensors for use in OFN applications

9    for sale in the United States.

10       81.   In an overt attempt to keep PixArt from competing for OFN application sales,

11   Avago notified PixArt in October 2009 of its acquisition of several OFN patents and asserted that

12   PixArt's OFN products were not covered by the Settlement and License.  In later correspondence,

13   Avago demanded that PixArt refuse to represent to third parties that the License covered PixArt's

14   OFN products and threatened PixArt with yet more litigation if PixArt refused to adhere to

15   Avago's demands.  On information and belief, Avago also told actual and potential customers that

16   the License did not cover PixArt's OFN products and that Avago had threatened further legal

17   action against PixArt.  Pursuant to PixArt's later filing, these communications led PixArt's

18   customers to refuse purchase and incorporate PixArt optical navigation sensors into end products

19   without assurance from PixArt that its OFN products did not infringe Avago's patents or that it

20   had the allegedly necessary licenses from Avago to sell such products.

21       82.   As a result of Avago's actions PixArt was forced—yet again—to file a lawsuit

22   against Avago and did so on February 8, 2010, seeking declaratory relief that its OFN or pseudo

23   trackball products fall within the scope of the Settlement and License.  Three days later, Avago

24   issued a press release titled "Avago Technologies Reasserts it's Strong IP Position in Optical

25   Finger Navigation."  In its press release Avago claimed that it had "not licensed [its OFN patent]

26   portfolio to PixArt or other navigation product companies for the purpose of making, using or

27   selling finger navigation products," and that notwithstanding the PixArt action Avago would

28   "continue to use all legal means at its disposal to vigorously protect it substantial investment in"

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   OFN technology. Avago later alleged counterclaims for breach of contract and declaratory relief,

2   which action remains pending.

3         83.    On information and belief, due to this apparently baseless lawsuit Avago has chilled

4   the market for OFN and successfully kept PixArt from aggressive competition in the OFN

5   application market in the United States and abroad.

6         **STMicro's Litigation—United States (EDTX)**

7         84.    Less than a week after STMicro publicly announced its newly repositioned OFN

8   module, Avago Vice President and General Manager, Navigation Interface Products, Khin-Mien

9   Chong attended a dinner unannounced in Singapore with STMicro representatives Stuart Clark

10   and Claude Dardanne and Avago representative Boon Chye Ooi. The dinner had been scheduled

11   by Mr. Ooi of Avago to thank STMicro for its efforts in designing and manufacturing a custom

12   microcontroller product for Avago. During the dinner, Mr. Chong, who had not been invited to

13   attend and appeared unexpectedly, announced that Avago had just filed patent litigation against

14   STMicro and that the two companies needed to discuss the lawsuit in light of STMicro's recent

15   announcement regarding its optical finger navigation products. As discussed below, however, the

16   complaint against STMicro did not mention optical finger navigation products, and the only

17   product identified in the complaint was the VT5366 chip, which is not designed for optical finger

18   navigation applications.

19         85.    Avago filed its complaint ("Avago's Original Complaint") on March 15, 2010,

20   commencing a patent infringement lawsuit against STMicro in the Eastern District of Texas, Case

21   No. 6:10-cv-00092-LED. Avago alleged that STMicro infringed four patents that collectively

22   cover "fundamental enabling technology for, as well as improvements in optical navigation

23   sensors and related devices that do not require use of a mouse pad." Avago's Original Complaint,

24   ¶ 15. The only product identified in the complaint as allegedly infringing was STMicro's VT5366

25   product—a product that STMicro had been publicly advertising for over six years. Avago's

26   Original Complaint did not mention optical finger navigation products generally or STMicro's

27   VT5376 product specifically.

28

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

86.   The four patents asserted in Avago's Original Complaint include:  (1) the '354

Patent acquired from Microsoft; (2) the '720 Patent that was asserted against PixArt in the lawsuit

filed over six years earlier; (3) Patent No. 7,652,661 ("'661 Patent"), entitled "Seeing Eye Mouse

for Computer Systems"; and (4) Patent No. 7,643,007 ("'007 Patent"), entitled "Method of

Operating An Optical Mouse".

87.   Notably, none of these four patents read on the optical sensor alone—for example,

the accused VT5366 sensor.

88.   Although STMicro has sought discovery regarding Avago's pre-suit investigation,

an investigation mandated by Federal Circuit law, Avago has declined those requests and a

motion to compel such discovery is currently pending.  On information and belief, as of the date

of the filing Avago had not conducted a proper pre-lawsuit investigation with respect to the

allegations contained in the complaint.

89.   Significantly, despite Avago's efforts to describe the lawsuit as being targeted to

OFN applications, Avago's Original Complaint contains no reference to "optical finger

navigation" or "OFN."  It also includes no reference to STMicro's VT5376 optical navigation

sensor (for optical mice or OFN application) and the only accused device originally identified

was STMicro's VT5366 product, which is not designed for OFN applications.

90.   On information and belief, although Avago's Original Complaint did not accuse or

mention any of STMicro's OFN products and instead only accused older non-OFN products,

Avago immediately and broadly communicated the alleged "fact" that it had sued STMicro with

respect to the use of their sensors in OFN applications in a deliberate and intentional attempt to

keep STMicro from competing with it and gaining traction in the quickly developing OFN

applications market.  On information and belief, Avago made these assertions while knowing,

understanding and recognizing that the scope of Avago's Original Complaint was not directed to

the OFN Market.

91.   Four months later, on July 20, 2010, Avago filed a Second Amended Complaint in

which it asserted a fifth patent:  Patent No. 7,126,585 ("'585 Patent"), entitled "One Chip USB

Optical Mouse Sensor Solution."  Simultaneously, Avago filed its infringement contentions.  In

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-26-

COMPLAINT

its contentions, Avago failed to identify any directly infringing third-party applications utilizing

STMicro's OFN products.  Although Avago identified the VT5376 and VD5376 chips as

infringing the '585 Patent, the specific application that Avago identified was an optical mouse

reference design, not an OFN application.  Nor did Avago identify any use in the United States of

STMicro's VT5376 and VD5376 chips in third-party OFN applications.  Instead Avago sought to

cure the falsity of its prior misleading statements by muddying the waters and alluding to

infringement by "any other product that contains the VT5376 sensor" even though Avago did not

identify any such product, let alone one that had been imported and sold in the United States.

Specifically, Avago's infringement contention stated, "Avago contends that any other product that

contains the VT5376 sensor infringes the claims listed below for the reason listed below with

respect to the VT5376 sensor."  Notably, this allegation was made solely with respect to the '585

Patent added to the case that same day and Avago made no infringement contentions—directly or

by allusion—to any United States OFN product or related application or with regard to any of the

four originally asserted patents.

92.    Finally, over four months after filing Avago's Original Complaint, and after

repeated demands by STMicro seeking discovery into Avago's pre-suit investigation of

STMicro's alleged infringement, Avago filed its Third Amended Complaint on August 23, 2010,

in which it mentions "optical finger navigation" for the first time.  Specifically, Avago asserts:

> In particular, the inventions in the Asserted Patents include
> fundamental enabling technology for, as well as improvements in
> the design of, optical navigation sensors and navigation devices
> comprising such optical navigation sensors that do not require use
> of a mouse pad, including, but not limited to optical mice and
> optical finger navigation (OFN) devices.

Third Amended Complaint ¶ 14.  Again, however, Avago failed to accuse any specific third party

OFN application made, used, offered for sale, sold, or imported into the United States—

containing the allegedly infringing STMicro sensor.

93.    Avago has recently moved to amend its infringement contentions.  Notably,

however, again, in none of its contentions or other discovery filed to date has Avago identified

any third-party OFN application that uses an STMicro optical navigation chip.  To the extent that

COMPLAINT

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Avago alleges that its Original Complaint is directed to OFN applications, its claim is objectively baseless in whole or in part.  In the alternative, and to the extent that Avago alleges that its Original Complaint is not directed to OFN applications, it has engaged in false and misleading representations.

**Direct Customer Communications and Threats**

94.    Avago has sought to leverage its litigation activities and patents and has used direct and indirect communications with actual or potential customers to further chill the Markets and generate fear among customers interested in doing business with Avago's competitors.

### Website Communications

95.    Avago relies on statements on its website to instill fear and uncertainty into the Markets and to cast doubt on the right of *any* actual or potential competitor to compete in the Markets.  For example, Avago boldly declares that it has "numerous patents relating to imaging and optical navigation in countries around the world" but offers no details about its particular intellectual property rights or the reach of those alleged rights.  The website describes the steps Avago has taken to protect its alleged "extensive intellectual property assets," which includes a list, with links to press releases and key documents, of the litigation Avago has threatened and/or pursued, including the lawsuits against PixArt, Elan and CompUSA.  Avago also tells customers that "it is important to inform others of the legal actions that [Avago] has taken so far."  And, in a not-so-subtle but veiled threat, Avago warns its actual and potential customers, through its website, that it "can take legal action against unlicensed parties making, selling, offering to sell or importing products that infringe Avago's patents. Such parties may include *makers of navigation sensor chips, semiconductor lasers, optical mice and laser mice products, as well as distributors and retailers of these products*." *See* http://www.avagotech.com/pages/products/intellectual/ (emphasis added).

96.    Notably, the webpage has not been updated and contains false and misleading statements and omissions regarding the status—and merits—of Avago's litigation efforts, as well as the relative strength and scope of its asserted IP.

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

**Targeted Customer Threats and Communications**

97.     In addition to its website, Avago has engaged in a concerted effort to monopolize the optical sensor Markets by engaging in a number of direct communications with actual and potential customers for the purpose and with the intent to keep them from purchasing OFN products from anyone other than Avago.  On information and belief, potential STMicro's customers for the OFN application have been directly targeted with Avago's communication tactics and, as a result, are concerned with the perceived risks associated with purchasing STMicro's OFN products because of the threat of costly and protracted litigation with Avago. Meanwhile, Avago has successfully marketed and sold millions of dollars in OFN products in 2010 alone.  In an April 15, 2010 press release, Avago announced that it would be supplying an "OFN module manufacturer" with optical navigation sensors and that it expects that single order to generate in excess of $40 million for Avago in the next year.  As of June 18, 2010, Avago was supplying OFN components to eight manufacturers for use in 16 different cellular handset modules, including several prominent North American handset OEMs.

98.     Throughout 2009 and into 2010, Avago communicated directly with numerous actual and potential purchasers of optical navigation sensors warning that it would pursue an aggressive IP strategy in the optical navigation sensor space generally and with regard to OFN applications specifically, all in an overt attempt to use its dominant market position and to dissuade buyers from purchasing optical navigation sensors for OFN from anyone other than Avago.   In early 2010, Avago's senior executives also met individually with key buyers of optical navigation sensors for OFN applications as part of its ongoing effort to use its market dominance, its extensive patent portfolio, the alleged STMicro patent litigation and the threat of future litigation to discourage these buyers from purchasing optical navigation sensors from anyone other than Avago.

**CrucialTec**

99.     CrucialTec, is a South Korea-based manufacturer of input devices that utilize optical technology for mobile phones, SmartPhones and IPTV remote controllers.  CrucialTec met with STMicro in the spring of 2009 to discuss the purchase and sale of STMicro's sensors.

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

1   During that meeting, and in all subsequent meetings, CrucialTec indicated that it had received

2   intimidating and threatening communications from Avago and expressed concern about

3   purchasing sensors from STMicro out of fear of retaliatory conduct from Avago. CrucialTec

4   nevertheless reacted favorably at the meeting and advised STMicro that it wanted to use the

5   STMicro sensor instead of the Avago sensor. STMicro and CrucialTec met again in September

6   2009 to further discuss the details of the business relationship and reached agreement on the cost

7   of products to be supplied by STMicro. By the end of November, a detailed written agreement

8   had been prepared under which CrucialTec agreed to purchase one million optical navigation

9   sensors for OFN application per month in 2010 from STMicro; which agreement was ready for

10  execution by the end of 2009.

11          100.   On information and belief, upon learning of the imminent deal between STMicro

12  and CrucialTec, Avago immediately provided CrucialTec with the OFN Market Letter, asserting

13  the '354 Patent, and sought a meeting with CrucialTec. Avago met with CrucialTec in early

14  January 2010 and, periodically thereafter, leveraged its patent portfolio and apprised CrucialTec

15  of its lawsuit with STMicro including, on information and belief, its assertion that the lawsuit was

16  directed to OFN applications. Shortly thereafter, CrucialTec—concerned about litigation and

17  other retaliatory actions from Avago—backed out of the proposed agreement with STMicro.

18  CrucialTec later discussed Avago's threats with STMicro's Korean sales team, including Mr.

19  Kenji Tan. On April 16, 2010, Avago issued a press release announcing a $40 million deal with

20  a customer believed to be CrucialTec to purchase Avago's OFN sensors.

21                  **Vista Point**

22          101.   Vista Point Technologies, a business division of Flextronics International, is a

23  leading provider of optomechatronics solutions for consumer electronics and other products.

24  Vista Point offers ultra low power sensor interface and transceiver platforms that can be used for

25  a variety of applications including OFN modules for mobile phones. Vista Point is a potential

26  and actual supplier of OFN modules to mobile phone OEMs, including, on information and

27  belief, Research in Motion ("RIM"), makers of the Blackberry family of SmartPhones.

28

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

102.  STMicro and Vista Point began discussing a potential business relationship in late 2009 and into early 2010 regarding the development of an OFN module using STMicro's optical sensors that would ultimately be supplied by Vista Point to RIM.

103.  On information and belief, Avago met with Vista Point in April 2010.  During that meeting, Avago CEO Hock Tan advised Vista Point representatives that Avago would pursue an aggressive IP strategy in the optical navigation space generally and in the market for OFN solutions for mobile phones specifically, and he identified certain U.S. patents that he represented covered OFN products and applications, including the illegally acquired '354 Patent.  Mr. Tan also advised Vista Point that it would not license its OFN patents to third parties including STMicro and that Vista Point would need a license from Avago to safely purchase OFN sensors from any other supplier.

104.  Following this meeting, Vista Point—concerned about threatened legal action and retaliatory conduct from Avago—requested full indemnification from STMicro for any patent infringement claim that might arise based upon the use of STMicro's OFN sensors in any Vista Point or third party product, as a condition of purchasing STMicro's OFN sensors.

**Partron**

105.  Partron Co. Ltd. ("Partron") is a Korean company that produces high-quality electronic parts for mobile phones and base stations, such as chip and GPS antennas, dielectric filters including duplexers and multiplexers, crystal products, isolators and camera module products.  In addition, the company works closely with its customers to develop custom product applications.  To date, Partron has not purchased optical sensors for OFN modules from Avago but competes directly with CrucialTec to supply mobile phone OEMs with OFN modules including, without limitation, Samsung.

106.  Avago sent Partron the Open Market Letter in an effort to coerce it to purchase sensors from Avago and to prevent it from dealing with STMicro and/or other actual or potential providers of sensors for OFN applications.  Partron has fielded expressions of concern from its actual or potential customers, who have indicated that hey were separately approached by Avago.

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

**Mitsumi**

107.   Mitsumi is a Japanese manufacturer of a wide array of components that are used in electronic devices manufactured by the premier names in automotive, consumer, and industrial electronics, including OFN modules for mobile phones.

108.   Mitsumi contacted STMicro in March 2010 and expressed interest in STMicro's VT5376 sensor for OFN applications.  During these and subsequent discussions, Mitsumi repeatedly expressed concern about Avago's recently announced patent lawsuit against STMicro and STMicro's right to sell Mitsumi sensors for OFN application in Japan.  On information and belief, Avago had previously met with Mitsumi, told Mitsumi about its lawsuit against STMicro (again characterizing it as involving allegations of OFN infringement), and made other comments designed to instill fear in Mitsumi about purchasing optical sensors from any other supplier other than Avago.

109.   On information and belief, Avago sought to coerce other market participants including, without limitation, BYD Microelectronics, a Taiwanese subsidiary of BYD Company Ltd., that is dedicated to the development of integrated circuits and power devices including component parts for mobile phones such as OFN modules.

**Other Recent Market Communications**

**The Market Infringement Letter**

110.   Aware of STMicro's imminent announcement that it would offer the VT5376 product for OFN application, Avago sent a letter to many if not all actual or potential buyers of optical sensors for OFN ("To Whom It May Concern") that warned that Avago holds "hundreds of issued patents," with several directly applicable to OFN, including, specifically, the illegally acquired '354 Patent.  The OFN Market Letter further declared that Avago had not directly licensed *any* of its OFN patents to other sensor manufacturers, despite having done just that with PixArt; and threatened "aggressive actions" against would-be infringers.  Avago specifically stated:

> Avago is confident of our IP rights and strength in our IP portfolio;
> and remains committed to servicing our handset customers through
> continued investments in innovation and technology leadership.

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Avago has not directly licensed its OFN patent portfolio to other
sensor manufacturers and we will take aggressive actions to protect
our IP rights against any infringement.

**Press Releases**

111.   These market communications were made against a backdrop of ongoing press

releases and announcements aimed at generating further fear and uncertainty in the Markets. For

example:

- In January 5, 2010 Avago issued a press release announcing its new OFN module that
  was remarkably devoid of any specific data or model number for the product and
  which largely focused on its patent portfolio, asserting that:  "Avago has secured
  hundreds of issued patents for its Optical Navigation Intellectual Property (IP)...No
  patent license have been granted and thus only products containing Avago components
  will receive a royalty free license to the patent portfolio."

- On February 10, 2010, Avago issued another press release titled "Avago Technologies
  Reasserts it's Strong IP Position in Optical Finger Navigation."  The article
  emphasized its assertedly strong IP position as against PixArt and Elan and again
  asserted that Avago "will continue to use all legal means at its disposal to vigorously
  protect its substantial investment in this technology."

- On March 29, 2010, Avago issued a press release titled "Avago Technologies Files
  Optical Sensor IP Lawsuit against STMicroelectronics."  The press release served to
  emphasize Avago's efforts to prevent competition and, on information and belief,
  contained materially false statements regarding the Settlement and License and the
  scope of its IP.

**Avago Purposefully Hides the Inherent Limitations of Its "Strong IP Position" and
Improperly Seeks to Leverage its Patents Beyond Their Scope**

112.   Avago's campaign of fear and intimidation including contacts with actual or

potential customers and other market communications have failed to distinguish between foreign

and United States patents or disclose what particular purchases or sales might be affected by a

United States patent infringement lawsuit filed by Avago.  For example, on or about March 11,

2010, immediately prior to filing the lawsuit against STMicro, Avago approached Mitsumi, a

Japanese component provider that offers OFN modules solely for sale in the local Japanese

market.  As STMicro's sensors are manufactured overseas and would—if purchased by

Mitsumi—be delivered to Japan solely for sale in the Japanese market, the United State lawsuit

would have no effect on STMicro's ability to sell to Mitsumi.  Despite this fact, Avago visited

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  Mitsumi on the eve of filing suit against STMicro in the United States, and, on information and

2  belief, advised Mitsumi that it was filing suit against STMicro's OFN devices so as to stop sales

3  of those OFN devices by STMicro to Mitsumi and that Mitsumi would be at risk of litigation if it

4  purchased products from STMicro.

5      113.  Similarly, Avago has completely failed to the scope of its patents and distinguish

6  between optical mouse applications and other applications to which its patents may not apply.

7      114.  Such false and misleading statements were intended to and did coerce and dissuade

8  customers from purchasing optical navigation sensors for OFN applications from anyone other

9  than Avago including STMicro, and Avago's threats and false and misleading statements and

10  omissions were made without regard to their truth or falsity or the merits of the claim or the scope

11  of Avago's patent rights.

12                        **RELEVANT MARKET AND MARKET SHARE**

13      115.  The relevant market of commerce in which to analyze the effects of Avago's

14  anticompetitive conduct is:  (a) the market for optical navigation sensors, including mice and

15  OFN applications (the "ONS Market), and, in the alternative; (b) the market for optical navigation

16  sensors used in optical mice, excluding OFN (the "OMS Market"); and (c) the market for optical

17  navigation sensors suitable for use in optical finger navigation modules for mobile phones and

18  other smaller electronic devices (the "OFN Market").   The Markets also include related

19  technology markets, consisting of that technology or collection of technologies claimed in those

20  patents that are needed for the design, manufacture and use of optical mouse and/or optical finger

21  navigation sensors and/or related devices.  As used herein, the reference to sensors includes stand

22  alone chips and chips packaged in a housing.  Regardless of how any such market is defined,

23  Avago has more than 70% of the relevant market as well as the power to raise prices, reduce or

24  eliminate supply and exclude competition.

25      116.  Optical navigation sensors are or may be used in a variety of consumer electronic

26  products to control the movement of the cursor or pointer on the screen.  Consumers in these

27  specific Markets include optical mice OEMs, wireless handheld device OEMs, intermediary

28  suppliers of complete optical navigation modules to OEMs, and distributors who supply either the

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

1    module and/or sensors.  Until recently, optical mouse applications have accounted for virtually all

2    of the demand for optical navigation sensors with OFN applications just beginning to increase in

3    demand.  Depending on their particular need, customers may purchase stand alone optical

4    navigation sensors or sensors integrated into a housing unit.  In some cases, resulting products are

5    then in turn sold to device manufacturers, such as handset manufacturers who then resell the

6    product to telecommunication providers, OEM's, distributors or retailers who sell the product to

7    the end consumer.

8        117.   The relevant geographic market in which to assess Avago's conduct is worldwide

9    or, in the alternative, the United States.  The market shares reflected herein are intended to reflect

10   the worldwide market.  To the extent that there is a separate United States market, Avago's

11   market share and market power would be higher than that possessed in the broader worldwide

12   market due to its stronger patent portfolio and its greater ability to access, or threaten to access, to

13   the courts as a competitive tool.  Notably, while Avago's efforts to foreclose and exclude

14   competitors have been successful in the broader worldwide market, its efforts have been even

15   more successful in excluding competitors from the United States, including some competitors

16   who will not sell to OEMs located in or selling into the United States.

17       118.   Apart from the intellectual property laws, there is no reason that optical navigation

18   sensors suppliers cannot sell their products, directly or indirectly, in international commerce. The

19   majority of optical navigation sensor buyers, component assemblers and cellular handset

20   manufacturers are located primarily in Asia.  Additionally, optical navigation sensors and the

21   products that included them are physically small and easily transported around the world.  Optical

22   navigation sensor suppliers like Avago and STMicro are often unaware of the specific device or

23   ultimate geographic market into which devices incorporating their components will be sold.

24       119.   The OMS Market is often referred to as an accepted, defined market within the

25   industry and by Avago, as reflected in its press releases and statements on its websites.  It has

26   often been used synonymously with the ONS Market.  The OMS Market is characterized by

27   demand for use in optical mice and similar devices requiring optical navigation sensors that move

28   and track the position of a pointer on a computer screen.

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-35-

COMPLAINT

120. The OFN Market is similarly referred to as an accepted, defined market within the industry and by Avago, as reflected in its press releases and statements on its website. The OFN Market is characterized by demand for use in smaller handheld devices that require miniaturized, flipped optical navigation sensors with high precision.

121. From a functional perspective, other navigation devices such as mechanical mice can often serve the same function as an optical mouse (*i.e.*, controlling a pointer on a computer screen). Despite this functional similarity, the various navigation systems are not interchangeable but rather are an integral part of the overall structural design and componentry of the device including the user interface. OEMs and their optical navigation sensor suppliers must therefore choose a navigation option for each device from among the alternatives at the structural design stage and cannot thereafter easily change without having to redesign the entire device. As such, actual purchasers of optical navigation sensors do not have any substitutes and must purchase the componentry mandated by the system level integrator.

122. With the exception of touch screens, the navigation system contained within a larger consumer electronic device generally constitutes a small portion of the overall cost of the device and the choice of solution may well drive ultimate customer demand. As a result, the navigation system chosen for any particular product is chosen by the OEM based largely upon end user preference. Again, once the architectural decision is made the interim component manufacturers and the ultimate purchasers of optical navigation sensors are limited to considering only providers of the specified navigation solution.

123. End users (and OEM's) generally prefer optical sensor solutions over mechanical navigation solutions including rocker switches, scroll wheels, and mechanical track-balls. As Avago announced in a February 27, 2006 press release, "Today, the vast majority of computer users prefer optical mice, not just gamers and those who need the highest possible position accuracy." *See also* "Since their introduction, optical mice powered by Avago's optical sensing technology have become the standard in computer input devices." Optical mice eliminate the need for a mouse pad and offer more precise pointing and movement than mechanical mice.

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

1    Because optical mice have no ball or ball cavity, no cleaning is necessary, making them more

2    reliable and longer lasting." (Avago Press Release, January 9, 2006).

3           124.   While touch screens function as a navigation system, they do not offer the same

4    functionality as an optical or mechanical mouse.  Touch screens integrate the keyboard and

5    mouse functions offering a significantly different user experience at a significantly higher price

6    point.  As such, touch screens are not a close substitute for optical navigation sensors.

7           125.   More and more, end users are using SmartPhones and other small, handheld devices

8    for more sophisticated uses.  These devices can be used to navigate the internet in addition to the

9    more traditional uses like monitoring electronic mail or making and receiving telephone calls.

10   Other devices can be used to navigate music selections (*e.g.*, MP3 and MP4 devices), to control

11   electronic recording and playback devices (*e.g.*, remote controls), or to literally navigate a car,

12   boat or other vehicle (*e.g.*, GPS devices).  Given the small screen space and overall minimal size

13   of such devices, and the increasingly sophisticated navigation demands, optical sensors used in

14   such applications must generally be much smaller and more precise than traditional optical mouse

15   sensors.

16          126.   Optical navigation sensors may be differentiated and sold into the OMS, OFN and

17   to a significantly lesser extent other application markets.  At the present time, there is limited

18   demand for non-mouse/OFN applications.  Occasionally, the same sensor may simply be

19   repurposed and marketed to a different application.  In other cases, a manufacturer will optimize

20   the sensor to meet the specific requirements of the application market.  In many, if not most

21   applications, optical navigation sensor providers can adjust production to meet varying

22   application demand requirements.

23          127.   With respect to OFN, while some optical mouse sensors can be used in OFN

24   applications, others may be too large or lack the requisite degree of precision.  Sensors suitable

25   for OFN must be miniaturized and, due to the very limited surface space covered as compared to

26   OMS applications, have finely tuned navigation capabilities.  On information and belief, to date,

27   only 2-3 manufacturers have successfully miniaturized their optical navigation sensors and

28   achieved quality levels such that they can be used in most OFN applications.

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

128.   Barriers to entry to the Markets are high and have become increasingly difficult as a result of Avago's anticompetitive conduct.  The most likely entrants are CMOS image sensor manufacturers who market and sell devices which are used in cameras, webcams and camcorders.  Such entities have existing image sensor experience and access to manufacturing facilities and would be required to evolve their technology in order to process images in such a way as to allow the detection and tracking of movement, and to transmit that information electronically to a microprocessor, processor or computer, that would ultimately use that information to control the movement of the cursor or pointer on the screen.   Such entrants would be required to develop their own navigational algorithm in order to compete effectively in the navigation sensor market.  In order to successfully market and sell such sensors the new entrant would also need to either develop or team with third parties to permit the integration of these devices into specialized chips.  As the market is small and Avago's presence predominant, such opportunities may be difficult to obtain.  Potential market entrants would have higher technological requirements including the need for more precise navigational algorithms, pixel structure, semiconductor die restrictions and low power consumption.  The largest barrier to entry to any new market entrant, however, is Avago itself.

## ANTICOMPETITIVE EFFECT AND INJURY

129.   Avago has significant market power in the Markets, as evidenced by its high market share, its ability to exclude competitors and prevent new entry, and through its use of baseless and/or premature threats of patent litigation, patent litigation, illegal patent acquisition activity, patent leveraging, and well-orchestrated direct and indirect communications with key buyers, and competitor collaborations that collectively act to reduce competition in the Markets and as a further barrier to entry.  Direct evidence of Avago's unconstrained exercise of its monopoly power in the Markets and its anticompetitive effects includes its ability to limit and foreclose current and potential competition from third parties including SunPlus, Elan, PixArt and STMicro as part of its predatory and anticompetitive campaign, and its ability to raise and maintain prices above levels that would be established in an efficient and competitive market.

130. Avago's illegal and anticompetitive conduct has had an anticompetitive effect on the Markets, including the ONS, OMS and OFN Markets. Avago has chilled the marketplace, excluded competition, stalled or prevented innovation, increased barriers to entry in each of the Markets, compelled illegal agreements not to compete in all or some of the Markets, reduced consumer choice, reduced output and caused higher prices to manufacturers and end-users.

131. For example, the actionable and anticompetitive effect of Avago's agreement and collaboration with SunPlus was to reduce competition by removing one of Avago's few then-existing competitors from the OMS application Market during the term of the agreement thereby preventing competition on the merits which would likely have resulted in greater innovation and development of better products at lower prices for distribution to OEMs and consumer around the world. Additionally, as a direct result of SunPlus' agreement to "redirect" its optical mouse sensor development efforts to microcontrollers, Avago was able to increase its own growing and dominant share of the OMS Market. This, in turn, along with, on information and belief, other like arrangements, caused direct injury to competition generally, and STMicro in particular, because it reduced the number of competitors, thereby further increasing Avago's share of the OMS application Market and enabling Avago to engage in other anticompetitive conduct as outlined above.

132. Similarly, Avago's interference with STMicro's agreement with Microsoft delayed STMicro's entry into the Market, limiting and preventing competition and the benefits of competition on the merits in the interim including consumer choice, and competition in price and innovation. As the delay prevented early competition, Avago's conduct further enhanced Avago's market power and its ability to foreclose competitors and chill the marketplace through its anticompetitive conduct. On information and belief, this conduct may also have contributed to Avago's ability to cause Microsoft to transfer the '354 Patent to it in January 2007 which Avago is now using to continue its anticompetitive course of conduct.

133. The actionable and anticompetitive effects of Avago's unlawful acquisition of the '354 Patent include: (a) Avago's assertion of the '354 patent in public statements indicating that that it will protect its position in the ONS Market, the OMS Market and the OFN Market with

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    patent suits including, specifically, its patent suit against STMicro in which it alleges

2    infringement of the '354 Patent; (b) Avago's use of the '354 Patent to foreclose and block entry of

3    new competitors in the ONS, OMS and OFN Markets and its modified licensing strategy

4    including its refusal to license on competitive terms, as confirmed in its public proclamations that

5    it "has not licensed" *any* of its alleged OFN patents to *any* "navigation product companies" and

6    only customers purchasing Avago's finger navigation sensors are safe from Avago's aggressive IP

7    enforcement efforts; and (c) by its threatened and actual patent litigation seeking to enforce its

8    unlawfully obtained '354 Patent against STMicro, it has sought to, and on information and belief,

9    has eliminated competitors, prevented new entry and threatened to shut down other actual or

10   potential competitors in the ONS, OMS and OFN Markets; and Avago's patent enforcement

11   efforts, if successful, would result in an insurmountable barrier to entry on all the Markets.

12          134.   Avago's acquisition of the '354 Patent is an anticompetitive act that discards

13   previous constraints operating on the patent and on Avago's preexisting patent portfolio and

14   substantially lessens competition. The acquisition threatens to result—to the extent the patent

15   remains valid and Avago prevails in its construction of it—in Avago obtaining a complete

16   monopoly over the OFN Application Market and maintaining its dominant position in the OMS

17   Application Market. Prior to Avago's acquisition the '354 Patent had never been asserted in

18   litigation and, on information and belief, had never been used to constrain competition—indeed,

19   it had only been used, and on information was only ever attempted to be used to expand

20   competition (*e.g.*, the STMicro/Microsoft collaboration). The '354 Patent acquisition involved

21   substitutable technology to Avago's then existing patent portfolio and was acquired solely for the

22   purpose of market exclusion. Moreover, acquisition by any other market participant, none of

23   whom have the market power held by Avago, would have resulted in increased competition and a

24   leveling of the technology playing field in the Markets.

25          135.   Conversely, Avago's acquisition of the '354 Patent has enabled it to leverage its

26   preexisting market share and power to substantially lessen competition and foreclose and exclude

27   competition in the Markets and prevent entry into the OFN Application Market. Avago has

28   asserted the '354 Patent prominently in market communications and in its lawsuit against

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

1    STMicro and these threats—including enforcement of the '354 Patent as broadly and

2    unreasonably construed by Avago—operate as further pressure to induce customers not to do

3    business with STMicro or any other optical navigation sensor manufacturer other than Avago.

4    Additionally, since its illegal acquisition of the '354 Patent Avago has modified its licensing

5    behavior. For example, prior to the acquisition, Avago licensed PixArt so that it could compete in

6    the Markets. Upon acquisition of the '354 Patent, Avago reversed its stance and is refusing to

7    concede that PixArt is licensed or may compete in the emerging OFN Market.

8         136.   As a result of Avago's press campaign and litigation efforts, STMicro and other

9    actual and potential competitors have had to quell customer concern with respect to potential

10   litigation. As a result of Avago's threats, STMicro and others have at a minimum lost credibility

11   and product image with actual and potential customers, lost sales and expended significant time

12   and resources trying to correct Avago's misinformation and threats. As a result of the litigation,

13   STMicro and other competitors have diverted management time and attention from their

14   competitive activities, expended monetary resources in defense and acted less aggressively in

15   pursuing competition adverse to Avago. Every threat that Avago has made has had the direct and

16   foreseeable effect of causing STMicro and others to lose traction and has and will cause

17   competitors not to enter or pursue the Markets aggressively both in the United States and abroad

18   leading to less competition in price, innovation and choice.

19        137.   The actual and anticompetitive effects of Avago's collective actions outlined above

20   to achieve, maintain and aggressively assert its dominant position in the OMS and OFN Markets

21   have been to reduce competition and the number of competitors in those Markets, create

22   insurmountable barriers to entry to or delay entry of potential competitors, and create fear,

23   confusion and uncertainty among customers in those Markets, including component suppliers,

24   distributors, and device OEMs, about purchasing product from anyone other than Avago.

25        138.   STMicro has incurred separate antitrust injury from the violations of law alleged

26   as well as from the overall scheme and would not have incurred such injury in the absence of

27   Avago's illegal acquisition activity and anticompetitive actions. Avago's conduct has caused

28   actual and potential customers to decline to do business with STMicro or to seek costly business

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

concessions out of fear of litigation or other retaliatory acts from Avago and without regard to the merits or actual breadth of Avago's patent portfolio.  Given Avago's overwhelming share of the OMS and OFN Markets, STMicro's customers are unwilling to risk potential claims or retaliation from Avago that could potentially threaten their own ability to compete.  Examples of customers who would have purchased sensors for OMS and OFN applications but did not because of Avago's anticompetitive conduct include CrucialTec, Vista Point and Mitsumi, to name a few.  STMicro has suffered delayed entry into the market, losing an early entry advantage, diminished market share, lost past, present and future profits, lost customers and potential customers, and lost goodwill and product image.  Additionally, STMicro has expended significant time and resources to combat Avago's threats and false statements to actual and potential customers and competitors and well as to address Avago's assertion of the illegally acquired '354 Patent.

139.   The effect of Avago's acquisition and anticompetitive conduct has been to cause injury to STMicro and reduce competition in the Markets as a direct result of Avago's extensive efforts to chill the marketplace through intentionally timed but objectively baseless and/or prematurely filed litigation, direct and indirect threats to customers of ongoing, protracted and costly litigation, misrepresentations to the market regarding the alleged strength of its patent portfolio, and the anticompetitive actions and conduct outlined above.

140.   Such harm to STMicro and the harm to competition are the types of injury that antitrust laws were designed to prevent and those harms flow directly from that which makes Avago's conduct unlawful.

## COUNT I
## UNLAWFUL ACQUISITION:  CLAYTON ACT SECTION 7

141.   STMicro repeats and realleges each of the allegations above as if fully set forth herein.

142.   Avago's unlawful acquisition of the '354 Patent from Microsoft Corporation is an asset acquisition within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

143.   The effect of this acquisition has been to lessen competition and/or acquire and/or maintain a monopoly in the Markets violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

144. By reason of Avago's violation of Section 7 of the Clayton Act, STMicro has been injured in its business or property through the loss of past, present and future profits, by the loss of customers and potential customers, and by the loss of goodwill and product image.

## COUNT II
## MONOPOLIZATION: SHERMAN ACT SECTION 2

145. STMicro repeats and realleges each of the allegations above as if fully set forth herein.

146. Through its anticompetitive scheme to monopolize the markets, including but not limited to its unlawful acquisition of the '354 Patent, its threats and filing of vexatious, premature and repetitive litigation without regards to the merits, or the scope of its patent rights, its use of false misleading statement and omissions to mislead and intimidate customers and actual or potential competitors, its anticompetitive agreements, refusals to deal, coercion and other conduct in exercising its monopoly power to foreclose competition and prevent new entry, Avago has gained or increased its monopoly in the Markets.

147. By such acts, practices and conduct, continuing over the past decade and continuing today, Avago has engaged in a course of conduct that amounts to monopolization and unlawful exercise of monopoly power.

148. Avago's conduct has had a direct adverse effect on competition, as evidenced by the exclusion of actual and potential competitors in the OMS Market and OFN Market and Avago's ability to obtain supracompetitive prices for its optical navigation sensors.

149. Avago's conduct constitutes monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

150. By reason of Avago's violations of Section 2 of the Sherman Act, STMicro has been injured in its business or property through the loss of past, present and future profits, by the loss of customers and potential customers, and by the loss of goodwill and product image.

## COUNT III
## ATTEMPTED MONOPOLIZATION: SHERMAN ACT SECTION 2

151. STMicro repeats and realleges each of the allegations above as if fully set forth herein.

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

152.   Through its anticompetitive scheme to monopolize the markets, including but not limited to its unlawful acquisition of the '354 Patent, its threats and filing of vexatious, premature and repetitive litigation without regards to the merits, or the scope of its patent rights, its use of false misleading statements and omissions to mislead and intimidate customers and actual or potential competitors, its anticompetitive agreements, refusals to deal, coercion and other conduct in exercising its monopoly power to foreclose competition and prevent new entry, Avago specifically intended to monopolize the Markets.

153.   Avago has undertaken this course of conduct with the specific intent of monopolizing the Markets.  Avago's conduct presents, at minimum, a dangerous probability of success and as evidence by its high market share and abuse of market power it has in fact monopolized the Markets.

154.   Avago's conduct has had a direct adverse effect on competition, as evidenced by the exclusion of actual and potential competitors in the Markets and Avago's ability to obtain supracompetitive prices for its optical navigation sensors.

155.   Avago's conduct constitutes attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

156.   By reason of Avago's violations of Section 2 of the Sherman Act, STMicro has been injured in its business or property through the loss of past, present and future profits, by the loss of customers and potential customers, by the loss of goodwill and product image and the incurrence of fees, costs and expenses to which it would not otherwise be subject.

**COUNT IV**
**UNLAWFUL AND UNFAIR COMPETITION:**
**CAL. BUS. & PROF. CODE §§ 17200 *et seq***

157.   STMicro repeats and realleges each of the allegations above as if fully set forth herein.

158.   The acts and conduct of Avago as alleged above constitute unlawful and/or unfair business acts or practices as defined by sections 17200 *et seq.* of the California Business and Professions Code.

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

1    159.   Avago's acts of unlawful and/or unfair competition have proximately caused injury

2    to STMicro's business and/or property through the loss of past, present and future profits, by the

3    loss of customers and potential customers, by the loss of goodwill and product image and the

4    incurrence of fees, costs and expenses to which it would not otherwise be subject.  Avago's acts

5    of unlawful and/or unfair competition have caused harm to competition, to consumers and to its

6    actual and potential competitors.

7    160.   In engaging in the conduct alleged in this Complaint, Avago has acted in a manner

8    that is immoral, unethical, oppressive and/or unscrupulous.

9    161.   STMicro is informed and believes, and on that basis alleges, that Avago's acts may

10   also have resulted in substantial Avago profits, to date and in the future, to which Avago is not

11   entitled.

<strong>Unlawful Competition</strong>

13   162.   The acts and conduct of Avago as alleged herein violate Section 7 of the Clayton

14   Act, 15 U.S.C. § 18, and as a result they constitute unlawful business practices in violation of

15   section 17200 of the California Business and Professions Code.

16   163.   The acts and conduct of Avago as alleged herein violate Section 2 of the Sherman

17   Act, 15 U.S.C. § 2, and as a result they constitute unlawful business practices in violation of

18   section 17200 of the California Business and Professions Code.

<strong>Unfair Competition</strong>

20   164.   Avago's acts and conduct as alleged herein are incipient violations, and/or violate

21   the policy and spirit, of Section 7 of the Clayton Act, 15 U.S.C. § 18, and/or Section 2 of the

22   Sherman Act, 15 U.S.C. § 2.  These acts and conduct constitute unfair competition in violation of

23   section 17200 of the California Business and Professions Code.

24   165.   Through its anticompetitive scheme to monopolize the markets, including but not

25   limited to its unlawful acquisition of the '354 Patent, its threats and filing of vexatious, premature,

26   bad faith and repetitive litigation without regards to the merits, or the scope of its patent rights, its

27   use of false misleading statements and omissions to mislead and intimidate customers and actual

28   or potential competitors, its anticompetitive agreements, refusals to deal, coercion and other

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

1   conduct in exercising its monopoly power to foreclose competition and prevent new entry, Avago

2   has brought about or attempted to bring about a substantial lessening of competition.

3        166.   Avago's actions significantly and/or incipiently harm and threaten competition in

4   the Markets, as evidenced by the exclusion of actual and potential competitors in the Markets and

5   Avago's ability to obtain supracompetitive prices for its optical navigation sensors, and the

6   anticompetitive effect of these acts has caused STMicro's injury.  Avago's acts and conduct

7   amount to unfair competitive practices; they are against public policy because of their dangerous

8   tendency unduly to hinder competition; and they lessen fair competition through predatory,

9   restrictive, deceitful and/or otherwise oppressive conduct.  These acts and conduct constitute

10   unfair competition in violation of section 17200 of the California Business and Professions Code.

11        167.   Upon information and belief, these practices are motivated by an anticompetitive

12   intent or purpose, and not by any legitimate independent business reason.

13   **REQUEST FOR RELIEF**

14        WHEREFORE, STMicro requests that the Court enter judgment and grant relief as

15   follows:

16        1.   Adjudge Avago's acquisition of the '354 Patent in violation of Section 7 of the

17   Clayton Act, 15 U.S.C. § 18;

18        2.   Adjudge Avago violated Section 1of the Sherman Act, 15 U.S.C. § 1;

19        3.   Adjudge Avago violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

20        4.   Adjudge Avago violated Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

21        5.   Enter judgment for STMicro against Avago for three times the amount of damages

22   sustained by STMicro, together with the cost of action, including reasonable attorneys' fees and

23   such other relief as appropriate;

24        6.   Order divestiture, rescission and any further actions needed to establish

25   competitive conditions that would have existed but for the unlawful acquisition of the '354 Patent

26   and Avago's anticompetitive conduct;

27

28

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

7.     Grant such other equitable relief, including disgorgement of all unlawfully obtained profits that the Court finds just and proper to address and to prevent recurrence of Avago's unlawful conduct;

8.     Grant such other and further equitable or legal relief as the court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, STMicro hereby demands a jury trial as to all issues triable to the jury.

DATED:  November 5, 2010.

**PERKINS COIE** LLP

By: *Marta Palacios*
Marta Palacios (SBN 206018)
MPalacios@perkinscoie.com
Susan Foster (WA Bar No. 18030) (*pro hac to follow*)
SFoster@perkinscoie.com
Cori Gordon Moore (WA Bar No. 28649) (*pro hac to follow*)
CGMoore@perkinscoie.com

ATTORNEYS FOR PLAINTIFFS
STMicroelectronics, Inc. and
STMicroelectronics N.V.

PERKINS COIE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT